# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 12, 2016

## STATE OF TENNESSEE v. RANDY JACKSON

**Appeal from the Criminal Court for Shelby County**
**No. 13-02387   Chris Craft, Judge**

_____

**No. W2015-02021-CCA-R3-CD  -  Filed April 29, 2016**

_____

The Defendant, Randy Jackson, was convicted by a Shelby County Criminal Court jury of aggravated robbery, a Class B felony, and attempt to commit aggravated robbery, a Class C felony. *See* T.C.A. §§ 39-13-402 (2014), 39-12-101 (2014). The trial court sentenced the Defendant to consecutive terms of eleven years for aggravated robbery and nine years for attempted aggravated robbery, for an effective twenty-year sentence. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Josie S. Holland (on appeal) and Paul Guibao (at trial), Memphis, Tennessee, for the appellant, Randy Jackson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Christopher J. Lareau and Matthew Shaun Schielke, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the 2012 robbery of John Vogel and Scarlett Densmore outside Mr. Vogel's home. At the trial, Mr. Vogel testified that on the evening of July 23, 2012, he and Ms. Densmore, the mother of his daughter, were standing outside his home near Ms. Densmore's minivan when an African-American man approached them. Mr. Vogel said that although he saw the man about eighty yards away, Mr. Vogel did not think much of it. He said that as he and Ms. Densmore were talking, the man began running toward them with a

gun. Mr. Vogel said that he told Ms. Densmore to lie on the ground, that he lay on the ground and covered his head with his hands, and that he heard the man asking Ms. Densmore, "What have you got?" Mr. Vogel said that after about thirty seconds, he felt the barrel of the man's gun on his neck and that the man yelled, "What have you got motherf----? I will shoot your motherf------ a--." Mr. Vogel said he thought he was going to die. Mr. Vogel said that the man slightly pulled down Mr. Vogel's pants to determine if Mr. Vogel "had anything" and that Mr. Vogel told the man, "Man, I don't have anything." Mr. Vogel said that the man held the gun in his right hand and that the gun was a black semi-automatic pistol. He said the man wore a "doo rag," was six feet, two inches tall, and weighed about 170 pounds. He could not recall the man's hairstyle.

Mr. Vogel testified that he next heard the man talking to Ms. Densmore and rummaging through her purse. He said that after three minutes, he heard a car arrive, saw a man get out of the car, and heard the man ask, "Are we done here?" Mr. Vogel said that Ms. Densmore was crying and asked what she should do and that he told her to remain on the ground. Mr. Vogel said that he heard the car's engine start and drive away and that he got up and attempted to obtain the car's license plate number. He said, though, the car did not have a license plate. He said the car was "reddish."

Mr. Vogel testified that after the car drove away, he grabbed his car keys and attempted to follow the car. He said that he and Ms. Densmore got in his car, chased the reddish-colored car, caught up to the reddish-colored car, passed the car, made a u-turn, and began following the car. He said that the car drove into a Kroger parking lot and that he parked his car where he could watch. He said he called 9-1-1 and told the dispatcher about the incident, reported he was watching the reddish-colored car, and requested police assistance. He said that while he was waiting for the police, the reddish-colored car left the parking lot and drove away on a road that was "destitute and dark." Mr. Vogel did not follow the car but reported to the dispatcher the direction in which the car drove. He said the police arrived and apprehended "one of the subjects." He identified a photograph of the reddish-colored car, which depicted no license plate. He said that although he was provided a photograph lineup, he was unable to identify the man who pointed a gun at him outside his home.

On cross-examination, Mr. Vogel testified that the street lights were operating outside his home, that the reddish-colored car did not speed when it left the scene, and that the car drove away slowly.

Scarlett Densmore testified that on July 23, 2012, at 10:45 p.m., she and Mr. Vogel were talking outside Mr. Vogel's home and that a man ran from across the street to their location. She said the man pointed a gun at her and Mr. Vogel. She said the man was

African-American, tall, and wore "long jeans," a mostly white shirt, and a doo rag on his head. She said she saw braids coming out of the doo rag. She said that the man yelled for her and Mr. Vogel to "get down on the ground," that the man pointed the gun at her and Mr. Vogel, and that they complied. She said she first saw the man when he was running across the street and under a street light. She identified the Defendant as the man she saw running across the street and said she had no doubt it was the Defendant who robbed her.

Ms. Densmore testified that during the incident, a car arrived and parked beside her minivan, that a man got out of the car, that the man told her and Mr. Vogel to lie on the ground, that the man climbed on her back and looked though her pockets, and that she only saw the man's legs and feet. She said that the man took her keys and asked for her money. She said that she told the man to take her purse, that the man asked for her money again, and that she told him her money was in her purse. She said the man wore long jean shorts that came "half-way in between" and dark gray and turquoise tennis shoes. She said that although her arms were scraped from the gravel on the ground, she did not suffer serious injury during the robbery. She noted the car was a reddish-maroon four-door sedan.

Ms. Densmore testified that after the men left in the reddish-colored car, Mr. Vogel called 9-1-1 and that she and Mr. Vogel chased the men. She provided testimony similar to Mr. Vogel regarding the chase and said the police stopped the reddish-colored car and took one of the men into custody. She said that the man lying on the ground as the police apprehended him was the man who arrived outside Mr. Vogel's home in the reddish-colored car and who "had been on [her]" because she recognized the man's legs.

Ms. Densmore testified that her keys and her purse, which contained money, photographs of her children, medication, and miscellaneous items, were taken during the robbery. She noted her purse was large, red, and shiny. She said the police found her purse in a dumpster near the area where the man was apprehended. She identified photographs of her purse after it was recovered and noted her purse contained her wallet, driver's license, and receipts.

Ms. Densmore testified that the police provided her a photograph lineup, that she circled one photograph, and that she "believed" the man in the photograph was the man who pointed a gun at her and took her purse.

On cross-examination, Ms. Densmore testified that Mr. Vogel was the first person to tell her to lie on the ground. She said the gun was black and gray and was a semi-automatic pistol. She agreed that the incident occurred quickly and said that after she lay on the ground, she was unable to move or look around and only saw the lower portion of the men's

bodies. She said that during the chase, she and Mr. Vogel pulled beside the reddish-colored car and that she did not look inside the car because she was scared.

On redirect examination, Ms. Densmore testified that when she said "believed" during her photograph identification, she meant "believe within a certainty." She said she understood from the advice to witnesses form that she was not supposed to guess when identifying the suspects. She said she had no doubt that the Defendant was the person who ran from across the street and initiated the robbery.

Memphis Police Officer Vonzell Bibbs testified that he and Officer Errol Freeman received a report regarding a robbery and were told the victims were following a red vehicle related to the robbery. He said that the police dispatcher updated him and Officer Freeman about the car's location, that they saw the car, and that they initiated a vehicle stop. Officer Bibbs said that once the blue lights on the police cruiser were activated, the passenger got out of the car and ran. Officer Bibbs said that Officer Freeman detained the driver and that Officer Bibbs and another officer unsuccessfully attempted to apprehend the passenger. Officer Bibbs described the passenger as a skinny African-American male with long black hair. Officer Bibbs said the passenger took a quick glance toward him before fleeing the area.

Memphis Police Officer Justin Murray testified that he responded to the pursuit of the red car and that he assisted with the vehicle stop of the red car. He said that the Defendant was the passenger in the red car, that the Defendant fled on foot, that he chased the Defendant, and that he was unable to apprehend the Defendant during the chase. Officer Murray returned to the red car's location to assist the other officers who had detained the driver. He said that the Defendant looked at him before running and that the Defendant was about fifteen to twenty feet away.

On cross-examination, Officer Murray testified that the Defendant fled from the car after Officer Murray activated the blue lights on his police cruiser. He said the Defendant ran around a building and jumped over a fence to get away from him and Officer Bibbs, who also chased the Defendant.

Memphis Police Officer Errol Freeman testified that when the passenger of the red car fled the scene of the vehicle stop, he detained the driver, who initially did not follow Officer Freeman's commands. Officer Freeman said he told one of the other officers at the scene to look inside the dumpster located behind a nearby building for the victim's belongings. Officer Freeman said that he searched the red car for the victim's purse and that during his search, he found a handgun under the driver's seat. He noted the handle of the handgun was

visible from under the seat. He identified a photograph of the black and gray semi-automatic handgun.

Former Memphis Police Officer Jason Majewski testified that on July 24, 2012, he was asked by other officers to locate the Defendant, that he went to the Defendant's last known address, and that he spoke to the Defendant's mother. Mr. Majewski said that the Defendant's mother permitted them to enter her home, that he asked if the Defendant was home, and that the Defendant's mother said the Defendant was not there. Mr. Majewski said that he noticed the pull-down attic door was ajar, that he motioned toward the door, and that the Defendant's mother indicated the Defendant was in the attic. The Defendant was apprehended without incident.

Memphis Police Officer Eric Hutchinson testified that on July 23, 2012, he was a crime scene investigator and that he responded to where the red car was stopped by other officers. He stated that he found Ms. Densmore's purse inside a nearby dumpster. On cross-examination, Officer Hutchinson stated that the purse was returned to Ms. Densmore and that no fingerprint analyses were performed on the purse or its contents.

Memphis Police Officer Eric Carlisle testified that he was a crime scene officer and that he processed the red car for evidence. He identified photographs he took of the car and its contents. The photographs depicted a handgun under the front passenger seat, the .380-caliber bullet inside the gun's chamber, the gun's magazine containing live rounds that was inserted into the gun, and a black doo rag containing three .380-caliber live rounds. Another photograph showed the rear of the red car, which reflected no license plate. Officer Carlisle noted the black doo rag was found under the front passenger seat beside the handgun.

Officer Carlisle testified that he attempted to obtain fingerprints on the handgun and the magazine clip but was unsuccessful and that he obtained fingerprints on the front driver's side door and the rear passenger door. He said, though, the fingerprints he obtained did not have enough ridge detail. On cross-examination, Officer Carlisle stated that the analyst who examined the latent fingerprints was able to identify prints belonging to Tommy Bridges and Tameka Martin.

On redirect examination, Officer Carlisle testified that the fingerprint analyst noted in his report that latent fingerprints were obtained from the car but that the person who left the prints inside the car was not identified because the owner or owners of those prints were not contained in any police database. On recross-examination, Officer Carlisle stated that Mr. Bridges's and Ms. Martin's fingerprints were identified based upon their previous arrest records.

The parties stipulated to the following facts:

[T]hat on July 24, 2012 Officer E. Carlisle processed a red Pontiac Grand Prix for fingerprints. Then fingerprint lift cards bearing twelve transparent lifts were delivered to the Memphis Police Department Latent Fingerprint Section for examination.

On July 25, 2012, Latent Fingerprint Examiner Marvin Milner determined that a print lifted from the exterior driver's door frame was the fingerprint of Tommy Bridges . . . . Examiner Milner also determined that a print lifted from the exterior right rear passenger door handle was the fingerprint of Tameka Martin . . . .

Additionally, there are latent prints of value that remain unidentified. The . . . report titled, Latent Fingerprint Section Memphis Police Department, and dated 7-25-2012, is the record of Examiner Milner's conclusions.

Upon this evidence, the jury found the Defendant guilty of aggravated robbery relative to Ms. Densmore and of attempt to commit aggravated robbery relative to Mr. Vogel. The Defendant received an effective twenty-year sentence. This appeal followed.

As a preliminary matter, the record reflects that the trial court's order denying the Defendant's motion for a new trial was entered on July 31, 2015. The Defendant's notice of appeal, though, was not filed until October 14, 2015. Tennessee Rule of Appellate Procedure 4(e) requires the filing of a notice of appeal within thirty days of the order denying a motion for a new trial. The Defendant's notice of appeal was untimely, and the State requests that this court dismiss the appeal. However, the notice of appeal is not jurisdictional and may be waived in the interest of justice. T.R.A.P. 4(a). We note that although the Defendant sought permission to late-file his notice of appeal in the trial court, the proper venue for filing such a request lies with this court. *See State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Although the Defendant has not requested this court waive the untimely notice of appeal, we will consider the issue raised by the Defendant in the interest of justice.

The Defendant contends that the evidence is insufficient to support his convictions. Although he does not allege the State failed to prove beyond a reasonable doubt the elements of aggravated robbery and attempt to commit aggravated robbery, he argues the State failed to prove his identity as the perpetrator. The State responds that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). When identity of the perpetrator is solely based upon circumstantial evidence, the facts are required to be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993); *see Reid*, 91 S.W.3d at 277. "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). Aggravated robbery is defined, in relevant part, as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," which is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" *Id.* §§ 39-13-401(a) (2014), -402(a)(1).

In the light most favorable to the State, the evidence reflects that Mr. Vogel and Ms. Densmore were approached by a man pointing a gun. Ms. Densmore testified that she first saw the man running from across the street toward her and Mr. Vogel and that the man ran under a street light. Although Mr. Vogel was unable to identify the man, Ms. Densmore identified the Defendant as the man she saw running toward her and Mr. Vogel. She said the Defendant pointed a gun at her and Mr. Vogel and told them to lie on the ground. She described the Defendant's clothes and noted he wore a doo rag on his head. Mr. Vogel also recalled the man's wearing a doo rag. Although the Defendant slightly pulled down Mr. Vogel's pants while pointing a gun and demanding Mr. Vogel's property, Mr. Vogel told the Defendant, "Man, I don't have anything." Nothing was taken from Mr. Vogel.

The evidence likewise reflects that the second perpetrator, who arrived in a reddish-colored car, climbed on Ms. Densmore's back, looked though her pockets, took her keys, and demanded her money. She told the men to take her purse because her money was inside the purse. Ms. Densmore's purse contained money, photographs of her children, medication, and miscellaneous items.

Mr. Vogel and Ms. Densmore testified that after the robbery, they followed the reddish-colored car and that they called 9-1-1, reporting the robbery, their pursuit of the perpetrators, and their changing locations during the pursuit. Ms. Densmore testified that the man apprehended, who was the driver of the car, on the night of the robbery was the second perpetrator who arrived in the reddish-colored car. Ms. Densmore identified the man from his lower legs, clothes, and shoes. We note Ms. Densmore's purse was recovered from a dumpster near the location where the reddish-colored car was stopped by police officers. Mr. Vogel recalled that the reddish-colored car did not have a license plate when he attempted to obtain a license plate number, and photographs of the red car taken by the police showed the car had no license plate.

Memphis Police Officer Justin Murray participated in the vehicle stop of the reddish-colored car, and he identified the Defendant as the car's passenger who fled on foot. Officer Murray recalled that the Defendant was fifteen to twenty feet from him when the Defendant looked at him and fled the scene of the stop. Police officers searched the reddish-colored car and found a black and gray semi-automatic handgun and a doo rag. We note Mr. Vogel and Ms. Densmore testified that the handgun was a semi-automatic and was black and gray. Photographs taken by Officer Carlisle showed the handgun under the front passenger seat. The gun's magazine and chamber contained live rounds. Officer Carlisle recalled a black doo rag was found beside the handgun under the front passenger seat.

-8-

We conclude that the evidence is sufficient to support the Defendant's convictions and that the evidence sufficiently established the Defendant's identity as the perpetrator of the robbery. Although the Defendant claims that inconsistent witness testimony undermined the jury's verdict, the jury determined the witnesses' credibility and resolved all conflicts in the testimony in favor of the State. Ms. Densmore identified the Defendant as the perpetrator at the scene of the robbery, Mr. Vogel and Ms. Densmore chased the reddish-color car from the scene of the robbery, and Officer Murray identified the Defendant as the passenger in the reddish-color car who fled the scene of the traffic stop. We note that Mr. Vogel's inability to identify the perpetrators did not undermine Ms. Densmore's and Officer Murray's identifications of the Defendant.

In an attempt to frame his argument in the context of sufficiency of the evidence, the Defendant also argues Ms. Densmore's pretrial identification of the Defendant was unnecessarily suggestive. *See Neil v. Biggers*, 409 U.S. 188 (1972); *State v. Brown*, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990). The State correctly notes in its brief that the Defendant did not attempt to suppress Ms. Densmore's identification before the trial, that no evidence was presented at the trial relative to an unnecessarily suggestive identification, and that the record does not reflect the issue was raised in the motion for a new trial. We review this argument as a separate issue regarding pretrial identification and not as a component of the Defendant's sufficiency of the evidence issue. We conclude that the Defendant is precluded from raising this argument for the first time on appeal, and we will not consider it. *See State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) (stating "[i]ssues raised for the first time on appeal are considered waived"); *see also* T.R.A.P. 36(a). As we have previously stated, the evidence is sufficient to support the Defendant's convictions, and he is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's convictions.

_____
ROBERT H. MONTGOMERY, JR., JUDGE